UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

GRINNELL MUTUAL REINSURANCE
COMPANY,

          Plaintiff,

v.

GREAT LAKES INSURANCE SE, f/k/a
Great Lakes Reinsurance (UK) SE; and
MNDKK, LLC,

          Defendants.

Case No. 19-CV-1433 (PJS/LIB)

ORDER

---

       Thomas C. Brock, Robert E. Kuderer, and Madeline E. Davis, ERICKSON, ZIERKE, KUDERER & MADSEN, P.A., for plaintiff.

       Joseph F. Lulic, BROWNSON PLLC, for defendants.

       In October 2016, non-party Dingmann Brothers Construction of Richmond, Inc. ("Dingmann") installed a garage door in a building that was leased by defendant MNDKK, LLC ("MNDKK"). Due to the alleged negligence of Dingmann's subcontractor, the installation of the garage door caused concrete dust to spread throughout the building, contaminating MNDKK's personal property.

       MNDKK was insured by defendant Great Lakes Insurance SE ("Great Lakes") and Dingmann was insured by plaintiff Grinnell Mutual Reinsurance Company ("Grinnell"). MNDKK submitted a claim to Great Lakes, which paid the claim and then brought a state-court subrogation action against Dingmann. Grinnell defended

Dingmann under a reservation of rights and filed this coverage action against Great

Lakes and MNDKK.  After Great Lakes and Dingmann settled the state-court action,

Grinnell amended its complaint in this case to assert that the settlement agreement is

unenforceable against Grinnell.

This matter is before the Court on the parties' cross-motions for summary

judgment.  For the reasons that follow, Grinnell's motion is granted in part and denied

as moot in part and defendants' motion is denied.  Specifically, the Court agrees with

Grinnell that the injury that Dingmann caused to MNDKK is not covered under

Grinnell's policy.  Because there is no coverage, the Court need not reach Grinnell's

alternative argument that the settlement agreement is unenforceable against it.

## I.  BACKGROUND

MNDKK leases a building in Paynesville, Minnesota, and uses that building for

retail sales and storage.  Ward Dep. 11–12; Brock Decl. Ex. 7 at 2.  MNDKK contracted

with Dingmann to install an overhead garage door in the building.  Ward Dep. 13–17.

Dingmann subcontracted with Spanier Masonry ("Spanier") to cut a 12-by-12 foot

opening in the building to accommodate the door.  Brock Decl. Ex. 6 at 4–5.

The wall into which the opening was cut consisted of concrete block, mortar,

stucco, and drywall.  Brock Decl. Ex. 1 at 5; Ward Dep. 19.  Spanier used a dry saw to

cut the opening without doing anything to control the resulting dust.  Brock Decl. Ex. 7

at 3; Dingmann Dep. 16–17, 20.  Consequently, concrete dust spread throughout the building and contaminated MNDKK's property.  Dingmann Dep. 19–20; Brock Decl. Ex. 5 at 5.

MNDKK submitted a claim for the damage to Great Lakes, and Great Lakes retained Crawford & Company ("Crawford") to investigate.  Brock Decl. Ex. 7. Crawford reported that all of the items stored in the building had "some degree of dust" that "appeared consistent with the dust that was from the concrete cutting." Brock Decl. Ex. 7 at 3 (Report No. 1).  Great Lakes and MNDKK obtained estimates to clean up the dust, and Great Lakes eventually paid $153,735.65 on MNDKK's claim. Brock Decl. Exs. 8–10, 17.

In their answers to interrogatories, Great Lakes and MNDKK state that the property damage was "the amount of $153,734.64 as a cost to remove and clean up the dust."[1]  Brock Corrected Decl. Ex. 13 at 7 (Answers to Interrogatory Nos. 12–13).  Nearly a year after defendants served their answers to interrogatories, however, MNDKK's corporate designee testified that up to five percent of the cleanup cost may have been attributable to the need to clean up some larger pieces of debris.  Ward Dep. 58–59.

Great Lakes sent Dingmann a demand for the amount that it paid to clean up the dust and then initiated a subrogation action against Dingmann in state court.  Brock

---

[1] It is unclear why the amount recited in defendants' answer to this interrogatory is $1.01 less than the amount that Great Lakes paid MNDKK.

Decl. Ex. 11; ECF No. 17-2.  Dingmann tendered the claim to Grinnell, which initially

denied any duty to defend but later agreed to defend Dingmann under a reservation of

rights.  Brock Decl. Ex. 16; ECF No. 17-3 at 1–2.  Grinnell then commenced this

declaratory-judgment action to determine coverage under its policy.  Shortly thereafter,

Dingmann and Great Lakes settled the state-court action (over Grinnell's objection) via

a *Miller-Shugart* agreement.[2]  ECF No. 17-4; Brock Decl. Ex. 14.  Under the agreement,

Dingmann consented to the entry of a stipulated judgment in the amount of $190,000,

and Great Lakes agreed to collect the judgment only from the proceeds of Dingmann's

insurance policy.  ECF No. 17-4.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

---

[2]*See Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982).  Under a *Miller-Shugart*
settlement, the defendant agrees that a stipulated judgment in a particular amount may
be entered against it.  In return, the plaintiff agrees not to collect the stipulated
judgment from the defendant itself, but only from the proceeds of any available
insurance coverage.  The defendant essentially drops out of the litigation, and the
plaintiff pursues recovery from the defendant's insurer.

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in [its] favor." *Id.* at 255.

*B. The Grinnell Policy*

Under Minnesota law, the interpretation of an insurance policy is a question of

law. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co.*, 926 F.3d 1014, 1020 (8th

Cir. 2019). An insured bears the initial burden to show that a claim comes within the

policy's coverage. *Westfield Ins. Co. v. Robinson Outdoors, Inc.*, 700 F.3d 1172, 1174 (8th

Cir. 2012). The burden then shifts to the insurer to show that an exclusion applies. *Id.*

Exclusions are narrowly construed. *Id.* Nevertheless, "clear and unambiguous

language in a contract is given its ordinary meaning," *id.* at 1175, and courts are not free

to "graft a limitation into [an exclusion] that it does not contain," *In re SRC Holding*

*Corp.*, 545 F.3d 661, 668 (8th Cir. 2008).

Defendants do not explicitly identify the provision under which they are

claiming coverage, but it is evident that they are seeking coverage for property damage

under "Coverage A—Bodily Injury and Property Damage Liability." *See* ECF No. 76

at 5 (defendants' reply asserting that cleanup costs constitute "a type of property

damage"); ECF No. 70 at 6 (defendants' memorandum stating that the underlying claim

is neither for advertising injury nor personal injury).

Two endorsements to the policy exclude costs associated with silica

contamination.  *See* ECF No. 17-1 at 45, 50–51.  The first endorsement, entitled "Silica or

Silica-Related Dust Exclusion," states (in relevant part):

> 2.   Exclusions
>
> This insurance does not apply to:
>
> >   *        *        *
>
> b.   "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".
>
> c.   Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

ECF No. 17-1 at 45.

The second endorsement, entitled "Asbestos, Lead, and Silica or Silica-Related

Dust Exclusion," similarly states (in relevant part):

> 2.   Exclusions of SECTION I—COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY . . . are expanded by addition of the following exclusions:

\*       \*       \*

C.  Silica Or Silica-Related Dust

\*       \*       \*

2. "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica", "silica-related dust", or "silica" included as a constituent part of a product, such as, but not limited to, paint, brick, tile, gravel, concrete, fiberboard, and residential or commercial construction materials;

\*       \*       \*

4. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica", "silica-related dust", by any insured or by any other person or entity[.]

ECF No. 17-1 at 50–51.  Both endorsements also contain substantively identical

definitions of "silica" and "silica-related dust":

1. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

2. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

-7-

ECF No. 17-1 at 45; *see also id.* at 51.

In short, both endorsements contain (1) a provision excluding coverage for property damage associated with silica, and (2) a provision excluding coverage for cleanup costs associated with silica, with each provision in one endorsement closely resembling the corresponding provision in the other.

### 1. Effects of Silica

Pointing to the cleanup-cost provision, defendants argue that coverage is not excluded because the damage did not arise out of "the effects of" silica. Defendants contend that this language requires there to be a causal relationship between the claimed damages and the hazards associated with silica. Defendants argue that because none of the cleanup costs were specifically attributable to the hazards of silica—but instead would have been incurred even if the dust had not contained silica—the exclusion for cleanup costs is inapplicable.

This argument suffers from at least two fatal flaws: First, defendants misread the cleanup-cost provision. Second, even if defendants' reading of the cleanup-cost provision is correct, coverage is nevertheless precluded under the property-damage provision, which straightforwardly excludes coverage for property damage arising out of contact with and the presence of silica and silica-related dust.

With respect to the cleanup-cost provision:  Again, this provision excludes coverage for

> [a]ny loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

ECF No. 17-1 at 45.  As defendants read this provision, the words "the effects of" are grouped in the noun phrase with "silica" and "silica-related dust."  In defendants' view, therefore, each of the listed remedial activities for which coverage is excluded ("abating, testing for, monitoring," etc.) must apply to "the effects of" silica or silica-related dust. As a result, according to defendants, the exclusions are not triggered unless the damage is attributable to the hazards associated with silica.

Defendants' reading has a glaring problem:  It ignores the comma that follows "the effects of" and that clearly indicates that the phrase is part of the final item on the list of activities ("in any way responding to or assessing the effects of"), rather than part of the list of nouns.  When the comma is taken into account, the provision excludes coverage, not for "cleaning up . . . the effects of, 'silica' or 'silica-related dust,'" but rather for "cleaning up . . . 'silica' or 'silica-related dust.'"

This latter reading also makes more sense than defendants', as it is difficult to understand what it would mean to clean up, remove, or "dispos[e] of . . . the effects of"

silica or silica dust.  Again, defendants contend that the "effects of" language means

that the damage must be attributable to the hazards of silica.  But silica—and in

particular silica dust—is considered hazardous not because of the damage that it causes

to *property*, but because of the damage that it causes to *people*.  In particular, inhaling

silica dust can cause silicosis and may increase the risk of lung cancer.  *See* 29 C.F.R.

§ 1910.1000 (Occupational Safety and Health standard classifying silica dust as an air

contaminant); *id.* § 1926.1153, App. B ("Exposure to fine (respirable size) particles of

crystalline forms of silica is associated with adverse health effects, such as silicosis, lung

cancer, chronic obstructive pulmonary disease (COPD), and activation of latent TB

infections."); *RLI Ins. Co. v. Gonzalez*, 411 F. App'x 696, 698 (5th Cir. 2011) (explaining

that inhaling silica dust can cause silicosis and holding that "[s]ilica dust is

unambiguously a 'pollutant' under the language of the Pollution Exclusion").  Notably,

both endorsements separately exclude coverage for bodily injury arising out of the

inhalation or ingestion of silica and silica dust.  *See* ECF No. 17-1 at 45, 50.  If the only

"effects of" silica—that is, the hazards associated with silica—are damage to human

health (such as silicosis or lung cancer), defendants' interpretation would render the

cleanup-cost provision a dead letter.[3]  Read as a whole, therefore, the endorsements

---

[3]Presumably, defendants would argue that the cleanup-cost provision could apply to the cost of taking special safety precautions while cleaning.  Such costs arise out of the attempt to *avoid* the "effects of" silica, however; they do not arise out of

(continued...)

clearly and unambiguously exclude coverage for the cost of cleaning up dust that

contains silica particles.

Even if defendants' reading of the cleanup-cost provision were correct, however,

coverage would nevertheless be excluded by the property-damage provision in both

endorsements.  Again, that provision in both endorsements excludes coverage for

property damage "arising, in whole or in part, out of the actual, alleged, threatened or

suspected contact with, exposure to, existence of, or presence of," silica or silica-related

dust.  ECF No. 17-1 at 45, 50.

In their opening brief, defendants pretty much ignore the property-damage

provision.  *See* ECF No. 70 at 6 (identifying the cleanup-cost provision as the "only

exclusion language that needs analysis").  In their reply brief, though, they argue that

the property-damage provision does not apply because the more-specific language of

the cleanup-cost provision controls.  Because defendants raised this argument for the

first time in their reply brief, it is not properly before the Court.  *See Anderson v. Rugged*

*Races LLC*, 496 F. Supp. 3d 1270, 1285 n.11 (D. Minn. 2020), *appeal docketed*, No. 20-3436

(8th Cir. Nov. 20, 2020); *RedKing Foods LLC v. Minn Assocs. LP*, No. 13-CV-0002

(PJS/JSM), 2014 WL 754686, at *4 (D. Minn. Feb. 26, 2014).  Setting that aside, defendants

cite no authority for the proposition that exclusions must be mutually exclusive—and,

---

[3](...continued)
cleaning up, removing, or disposing of the "effects of" silica.

in the Court's experience, overlapping exclusions are extremely common. *See In re SRC Holding Corp.*, 545 F.3d at 670 ("[A]ny overlapping in the coverage excluded by Endorsements 3 and 9 is not sufficient to disregard the broad and unqualified language of Endorsement 3. Nothing prevents the parties from using a 'belt and suspenders' approach in drafting the exclusions, in order to be 'doubly sure.'").

Finally, defendants cite a number of cases that, they contend, show that the phrase "arising out of" in the exclusions means that there must be a causal connection between the damage and the hazards of silica. These cases are of little relevance. None of them have anything to do with exclusions for silica or any other type of pollutant; instead, they all concern unusual fact patterns involving injuries occurring in or near automobiles and generally turn on whether the injury arose from the "use" of the automobile. *Engeldinger v. State Auto. & Cas. Underwriters*, 236 N.W.2d 596, 600 (Minn. 1975) (intoxicated and unconscious passenger died after insured left him overnight in car); *Wyo. Farm Bureau Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 467 F.2d 990, 995 (10th Cir. 1972) (pedestrian injured when passenger threw a bottle out of the car); *Allstate Ins. Co. v. Truck Ins. Exch.*, 216 N.W.2d 205, 208–11 (Wis. 1974) (passenger accidentally shot driver while unloading rifle from truck); *Azar v. Emps. Cas. Co.*, 495 P.2d 554, 555 (Colo. 1972) (driver accidentally shot passenger inside stopped car); *Morari v. Atl. Mut. Fire Ins. Co.*, 468 P.2d 564, 566–67 (Ariz. 1970) (driver accidentally shot

passenger while unloading gun from truck); *Brenner v. Aetna Ins. Co.*, 445 P.2d 474,

477–80 (Ariz. Ct. App. 1968) (passenger accidentally shot other passenger while riding

in car); *Tucker v. State Farm Mut. Auto. Ins. Co.*, 154 So.2d 226, 229 (La. Ct. App. 1963)

(child playing in car caused it to roll downhill and fatally injure child's mother).

Unlike the (more or less) attenuated causal connections between the injuries and

the "use" of the automobiles in those cases, here the causal connection is direct and

straightforward:  The claimed damages are the cost to clean up "silica-related dust" and

therefore arise out of "the actual . . . contact with, . . . or presence of, . . . 'silica-related

dust.'"  There can be no doubt that this direct connection satisfies the broad meaning of

"arising out of."  *Travelers Prop. Cas. Co. of Am. v. Klick*, 867 F.3d 989, 991 (8th Cir. 2017)

("Under Minnesota insurance law, the phrase 'arising out of' means 'causally connected

with' and not 'proximately caused by.'" (citation and quotation marks omitted));

*Murray v. Greenwich Ins. Co.*, 533 F.3d 644, 649–50 (8th Cir. 2008) ("The phrase 'arising

out of' has been given broad meaning by Minnesota courts. . . . [It] has also been held to

mean originating from, or having its origin in, growing out of, or flowing from, and has

been accorded an equally broad reading when used in an exclusion to limit coverage."

(citation omitted)).

Defendants' attempt to read a limitation into the endorsements that does not

appear in the text runs afoul of Minnesota's "non-technical, plain-meaning approach to

interpreting pollution exclusions." *Midwest Fam. Mut. Ins. Co. v. Wolters*, 831 N.W.2d

628, 637 (Minn. 2013) (citation and quotation marks omitted).  Defendants do not cite a

single case holding that exclusions for the cleanup of contaminants only apply if the

insurer can show that some or all of the cost is specifically attributable to the particular

hazards associated with the particular contaminants.  The Court therefore rejects

defendants' argument that the exclusions only apply to costs specifically attributable to

the hazards of silica and silica dust.

### 2.  Presence of Silica

Defendants argue that, because Grinnell did not take samples of the actual dust

that was produced during the construction of the garage door, there is no evidence that

the dust that caused the damage contained silica.  This argument is frivolous.  There is

no dispute that the building is made of concrete block, mortar, and stucco, all of which

contain silica, Brock Decl. Ex. 1 at 4, 5 ¶ 1, *id.* Ex. 2 at 5 ¶ 1, *id.* Ex. 5 at 4, *id.* Ex. 6 at 2, 4;

that the dust was produced by dry cutting into these materials, Dingmann Dep. 16–17,

19, Brock Decl. Ex. 5 at 5, *id.* Ex. 6 at 5–6; and that dust produced in this manner would

include particles of silica, Brock Decl. Ex. 1 at 5 ¶ 2.  Setting that aside, Grinnell's experts

drilled holes around the garage door, collected the resulting dust, and determined

through chemical analysis that it contained silica.  Brock Decl. Ex. 1 at 1–2; *id.* Ex. 2

at 1–2, 5.

"Although the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Rohr v. Reliance Bank*, 826 F.3d 1046, 1052 (8th Cir. 2016) (citation and quotation marks omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). As Grinnell argues, "[t]he concrete wall contained, in part, silica, both as a matter of materials science and fact." ECF No. 75 at 2. Defendants' arguments to the contrary do not even manage to raise a metaphysical doubt and are patently insufficient to avoid summary judgment.

### 3.  Other Causes of Damage

Finally, defendants contend that Grinnell cannot establish what portion of the construction debris was dust and what portion of that dust contained silica. Defendants do not explain how this is relevant under the language of the policy, nor did they make this contention until their reply brief. It is therefore not properly before the Court. *See Anderson*, 496 F. Supp. 3d at 1285 n.11; *RedKing Foods LLC*, 2014 WL 754686, at *4.

Even if this argument had been properly asserted, the Court would reject it out of hand. To begin, defendants admitted, in their answers to interrogatories, that their

entire claim is attributable to the cost of cleaning up the dust.  Brock Corrected Decl.

Ex. 13 at 7 (Answers to Interrogatory Nos. 12–13).[4]  Setting that aside, the exclusions bar

coverage for property damage and cleaning costs arising "in whole *or in part*" from

silica-related dust.  ECF No. 17-1 at 45, 50–51 (emphasis added).  Even if some portion

of the cleanup costs could be attributable to debris other than dust, it is indisputable

that the damages arose "in part" from the presence of silica-related dust.  In short, the

silica exclusions plainly preclude coverage under the facts of this case.  The Court

therefore grants Grinnell's motion as to its claim for a declaration of no coverage.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

---

[4]True, MNDKK's corporate designee later testified that up to five percent of the
material that needed to be cleaned up may have consisted of small chunks of debris, the
largest of which were three to four inches in size.  Ward Dep. 56–59.  He also testified,
however, that any items covered with pieces of debris were also covered with dust.
Ward Dep. 33–34.  Further, he could not remember whether any items were damaged in
any way other than by getting dirty and offered nothing other than speculation that the
process for cleaning up the debris differed from the process for cleaning up the dust.
Ward Dep. 33–34, 57.  Even if there was a way to distinguish "dust" from
"debris"—and even if the policy required Grinnell to distinguish between the cost to
clean up the dust and the cost to clean up the other debris—the record indicates that
only a minuscule percentage of the damage could have been due to the cost of cleaning
up the other debris.

1.      Plaintiff's motion for summary judgment [ECF No. 60] is GRANTED as to

        Count I and DENIED AS MOOT as to Count II of plaintiff's amended

        complaint [ECF No. 17].

2.      The Court DECLARES that there is no insurance coverage under

        commercial general liability policy No. 0000403162 [ECF No. 17-1], issued

        to Dingmann Brothers Construction of Richmond, Inc. by Grinnell Mutual

        Reinsurance Company, for the damages and claims asserted in the

        Minnesota state-court action entitled *Great Lakes Insurance SE (formerly*

        *known as Great Lakes Reinsurance (UK) SE), as subrogee of MNDKK, LLC v.*

        *Dingmann Brothers Construction of Richmond, Inc.* [ECF No. 17-2].

3.      Defendants' motion for summary judgment [ECF No. 68] is DENIED.

        LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  July 20, 2021                          s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge